# REPORTS

OF

# CASES ARGUED AND DETERMINED

## AT THE JUNE TERM, 1863.

————◄ ► ►————

## AARON (A SLAVE) *vs.* THE STATE.

[INDICTMENT AGAINST SLAVE FOR MURDER OF WHITE PERSON.]

1. *Service of copies of indictment and venire.*—Where the prisoner is in actual confinement, and copies of the indictment and *venire* are served on him personally, (Code, § 3576,) it is not necessary that they should be read to him, although he is a slave, nor is it necessary that copies should also be served on his counsel.

2. *Admissibility of confessions.*—The confessions of the prisoner in this case, who was a slave, were held admissible, on the authority of the former decision of this court in the case, (37 Ala. 106,) although they were made to the constable who had him in custody, and who had said to him, "If you are guilty, it is better to say so, but, if you are not, we do not wish you to do so"; and although the prisoner had himself been examined as a witness, on an investigation before two magistrates respecting the homicide; and although the magistrates were in the company of men by whom the prisoner was attended at the time the confessions were made, and by whom he was being conducted to the place at which the adjourned examination was to be resumed.

3. *Conviction on one of several counts; former acquittal or conviction.*—Under an indictment containing two counts, one charging that the defendant, a slave, "unlawfully and maliciously" killed a white person, and the other that the killing was "unlawfully and voluntarily" done;· a verdict of "guilty as charged in the first count" having been rendered on the first trial, and a *nolle-prosequi* as to the second count having been entered after the reversal of the judgment on appeal,— this is no bar to a second conviction on the first count, nor good in arrest of judgment.

4. *Severance of trial; effect of separate judgments.*—Where an indictment, containing two good counts, charged two slaves with the voluntary

manslaughter of a white person; and, a severance having been granted, one of the defendants was found "guilty as charged in the first count," and a *nolle-prosequi* as to the second count was afterwards entered in his case; while the other defendant, in whose case a demurrer was erroneously sustained to the second count, was tried and acquitted on the first count,—*held*, that this was not good matter in arrest of judgment, after a second conviction on the first count, in the case of the first defendant.

5. *Change of venue: sufficiency of certified transcript.*—On change of venue in a criminal case, (Code, §§ 3608–15,) if the certified transcript fails to show that the court was held at the time required by law, or shows that the grand jury was organized, and the indictment returned into court, before the day on which the court was held, it must be corrected as the statute prescribes; and if this is not done, the judgment will be reversed on error or appeal, although the mistake was shown to the primary court, by other transcripts not properly returned, to be a mere clerical misprision.

FROM the Circuit Court of Mobile, on change of venue from Baldwin.

Tried before the Hon. C. W. RAPIER.

THE prisoner, who was a slave, was indicted in the circuit court of Baldwin county, jointly with another slave by the name of Ranty, for the homicide of one Louis Boudet, a white man. The indictment contained two counts; the first charging that the defendants "unlawfully and maliciously killed" said Boudet, "by striking him with a stick, or by cutting and stabbing him with a knife or spade"; and the second charging that the killing was done "unlawfully and voluntarily". At the term at which the indictment was found, the defendants were arraigned, and both pleaded not guilty; and a severance was granted on their application. At the next term, the venue was changed, in both cases, to Mobile county; and the defendant Aaron was there tried, at the December term, 1860, when the jury returned a verdict of "guilty as charged in the first count"; but the judgment of conviction thereon rendered was reversed by this court, at its January term, 1861, and the cause was remanded.—See the case reported in 37 Ala.

At the May term, 1863, as the bill of exceptions in the present record shows, a *nolle-prosequi* was entered as to the second count of the indictment in Aaron's case; and he was put on his trial on the first count, issue being joined on

the plea of not guilty. The prisoner moved to quash the *venire,* "because the same had not been served on him according to law, nor upon his counsel as required by law"; and he also objected to going to trial, "because a copy of the indictment had not been served on him, nor upon his counsel, according to law". In support of these motions, it was proved to the court, by the deputy sheriff, who made the service, that copies of the *venire* and indictment were served on the prisoner, who was then in jail, more than two entire days before the day appointed for the trial; but that they were not read to him, nor were copies served on his counsel, though he requested that they might be served on his counsel. On this proof, the court overruled the objections, and the prisoner excepted.

The prisoner then objected to the certified transcript of the record which had been forwarded by the clerk of the circuit court of Baldwin, because it showed, in its caption, that the circuit court of Baldwin was held, and the grand jury organized, "on the second Monday after the fourth Monday in *November,* 1858," while the indictment itself, as set out in said transcript, purported to have been returned into court on the 9th day of November, 1858. The counsel for the State then produced to the court two other transcripts of the record from Baldwin circuit court, one of which had been forwarded under an order for "the original bill of exceptions" which had been taken before the change of venue, and the other under a *certiorari* awarded in Ranty's case; and in both of these transcripts the caption stated, that the court was held on the second Monday after the fourth Monday in *October.* The prisoner objected to the inspection of these transcripts by the court, and reserved an exception to the overruling of his objection. "The court then required the prisoner to go to trial; but, some question arising, as to which one of said transcripts should be used before the jury, the court said, that the copy of the indictment in either one might be used, as it was the same in all; and that it made no difference whether the verdict of the jury was written on either transcript, or on a separate piece of paper; to which sayings and rulings of the court the prisoner also excepted. The prisoner then insisted, that the

counsel for the State should select and designate which one
of the three transcripts would be used on the trial, and ob-
jected to going to trial until such selection and designation
were made; and the counsel for the State having, with the
sanction of the court, and at its suggestion, selected the
first (or original) transcript, the prisoner, by his counsel,
objected to being tried on that record, on the same grounds
hereinbefore stated to have been urged against its reception
and use on the trial. But the court, without any correction
or amendment of the record, other than that contained in
and furnished by the two other transcripts above mentioned,
ruled, that the prisoner should be tried on the indictment
set out in said original transcript; to which ruling of the
court the prisoner excepted."

"The State then introduced as a witness one J. Eslava,
who testified, among other things, that the prisoner was a
runaway at the time of the death of Boudet; that his own-
er's agent obtained possession of the prisoner prior to the
examination which was afterwards had, before two justices,
touching the killing of said Boudet; that he (witness) was
present at said examination; that the prisoner and Ranty,
another slave, were also present; that, to the best of his
recollection, the prisoner was sworn and questioned by the
justices; that the prisoner positively denied having had any
part in the killing of the deceased; that having understood,
in the course of the next morning, that the prisoner had
made a confession to one Washington Nelson, he (witness)
asked the prisoner, how he came to tell about the murder;
that the prisoner replied, 'he had had a dream last night,
and saw the old man (referring to the deceased) so visibly
that he thought it best to tell'; and that the prisoner then
made a statement, or confession, to him. The examination
of said Eslava being then suspended by the court, at the
request of the prisoner's counsel, said Washington Nelson
was introduced as a witness for the State. The prisoner
objected to the witness being allowed to testify to the jury,
as to any confessions made to him, until the State had first
proved that the confessions thus offered were free and vol-
untary. Said witness, being then examined as to the cir-
cumstances under which said confessions were made, stated
as follows:

Aaron (a slave) v. The State.

"The prisoner and Ranty, who were charged with the murder of the deceased, were brought before Nimrod Underwood and Joseph Nelson, justices of the peace in and for Baldwin county, sitting together in their official capacity, for examination touching the murder of said Boudet. Said examination was had on the 27th April, 1858, about one week after the murder. At this examination, witness thought, but could not remember distinctly, that the prisoner was sworn, and made a statement to said magistrates, which was, then and there, reduced to writing by said Underwood. This written statement was found among the papers in the case, was produced, and submitted to the witness for inspection; and the witness said, that he could not remember what was said by the prisoner on that occasion, and could not say that said paper contained what was said by him. Said statement was not then, nor at any subsequent time during the trial, offered in evidence. Said witness further testified, that after said examination was over for the day, the prisoner was placed in his custody, as special constable, to be kept until the next day, when it was proposed to continue or renew the examination at another place; that the prisoner was in irons when he took charge of him, and was carried by him from the place where the examination was held, to the residence of his father, the said Joseph Nelson; that the witness and the prisoner were accompanied during this journey by several persons, among whom were the two said justices; that the two justices conversed with the prisoner, while on the way, respecting the murder; that these conversations were held in the presence and hearing of the witness, but he could not say what they were; that said Joseph Nelson, while the prisoner was at his house that night, again conversed with him concerning the homicide; that this conversation also occurred in the presence and hearing of the witness, but he was unable to testify to anything that was said by said Joseph to the prisoner, and could not say whether or not any promises or threats were employed by said Joseph to induce the prisoner to confess; that on the next morning, while on their way to the place appointed for continuing the examination, witness was accompanied by said justices, and had the

prisoner in his charge; that said justices conversed with the prisoner, during this journey, concerning the killing of the deceased; that these conversations were carried on in his hearing, but he was unable to say what was said, and could not state whether any promises or threats were employed by said justices to induce the prisoner to confess; that these conversations occurred, he thought, some hour or two previous to the time when the prisoner made a confession to him. Witness himself, he said, also talked to the prisoner this same morning in respect to his connection with the murder. He could not undertake to say that he remembered all that was said by him to the prisoner on this subject, nor could he remember the precise language he had used in this connection. As well as he could remember, he said to the prisoner in substance as follows: 'If you are guilty, it is better to say so, but, if you are not, we do not wish you to do so; truth is the best policy always.' At the time witness made these remarks to the prisoner, they were both walking a little in advance of the rest of the company. After hearing them, the prisoner walked on a little way, with his head down, as if reflecting, and then made to witness the conversation referred to. Witness had kept the prisoner, during the night before, chained up, with handcuffs on his wrists; but, a short time before the confession was made, had removed the handcuffs, because the prisoner complained that the irons hurt him. Beyond what he had said to the prisoner, as above set forth, witness made no promises or threats to the prisoner to induce a confession, nor did he know of any such being made by any one else.

"The above being all the evidence of the witness on this point, the prisoner objected to the admission as evidence of any confession alleged to have been made by him to the witness; but the court overruled the objection, and permitted the witness to relate the confession made to him by the prisoner under the circumstances above detailed; to which ruling of the court the prisoner excepted. The witness then stated the confession made to him to be in substance as follows: The prisoner said, that he was chilly, or had chills, and went to Ranty's to get a dram, and asked

Ranty to go to *Louis'* and get the whiskey; that Ranty replied, Boudet was saucy, and had threatened to shoot him if he caught him about his place again; that Ranty said, he would go and kill 'old *Louis*', and then get the whiskey; that he tried to dissuade Ranty from this course, and begged him not to kill the old man; that Ranty tried to persuade him, and after a while he consented to go, but said that he would not do anything to Boudet; that they took a jug, and went on their way to Boudet's shop; that he walked behind Ranty in going and coming, and stepped in his tracks; that Ranty went into Boudet's house, but he remained outside; that he heard Ranty give the old man the first blow, and the old man cried out, 'Oh! Oh!' that he heard a second and third blow, and then went round to the door when Ranty was coming out; that Ranty went back, and got a knife to stab the old man; that he begged Ranty not to cut the old man, as he had served him bad enough; that Ranty replied, he had done so much he would finish him, and then stabbed him four or five times; that he then went in, and hit the old man two licks with a spade; that Ranty then got whiskey from a big jug, and took some money from Louis' cap, and some from over the door, and some from under a mattress; that Ranty gave him eleven dollars, and promised to give him more; that Ranty pulled the stick from under the old man, and threw it in a certain direction, and also the knife. And the witness said they afterwards found both as indicated.

"The witness Eslava was then recalled by the State, and was asked to state a confession made by the prisoner to him. The witness replied, that a short time after the said confessions to Washington Nelson and Joseph Nelson, while witness, the prisoner, said Nelsons, and others, were on their way to the scene of the murder, to verify the said previous statements of the prisoner, witness asked the prisoner about said previous statements to the Nelsons; that the prisoner was still in the custody of said Washington Nelson; and that he used no threats, nor held out any inducements to the prisoner, to make a confession. This being substantially all the evidence of the witness on this point, the prisoner objected to the witness being allowed

to give evidence of any confession made to him under the circumstances mentioned, because the State had not shown that such confessions were free and voluntary; but the court overruled the objection, and permitted the witness to state the confession made to him by the prisoner; to which ruling of the court the prisoner excepted.

"The witness Eslava then stated, that the confession made to him by the prisoner was substantially as follows: The prisoner said, that the old man had appeared to him the night before, and it was no use denying it any longer; that Ranty had been after him a long time to kill the old man; that he made up his mind the day he was killed, and went with Ranty; and that they killed the old man, with a spade and a knife, between four and five o'clock on Wednesday. The witness stated, that the party found the stick and knife, as previously described by the prisoner, and that he immediately recognized them; that the prisoner also said, the tracks to and from Mrs. Weeks' house and that of the deceased were his, and that Ranty went through the marsh barefooted, so as not to show his tracks; that Ranty stabbed the old man twice with the knife, and he (the prisoner) only hit him twice with the flat of the spade; that Ranty took the money, and gave him eleven dollars, and told him he would give him more when the matter was hushed up. The witness also testified, that the prisoner said Ranty sawed a stick at his house before they went to old Louis'; and that witness, with other gentlemen, went to Ranty's shanty, and found the other end of the stick; also, that they found, near the body of the deceased, a spade with blood on it.

"The State then offered said Joseph Nelson as a witness, who testified, that he was a justice of the peace for Baldwin county, and co-operated with said Underwood in conducting the examination of the prisoner and Ranty, upon a charge of murdering Boudet, on the 27th and 28th April, 1858, and heard the statement made by the prisoner before said examining court; that the first statement was made on said 27th April, and was then and there reduced to writing by him as justice, and was made under oath by the prisoner." (The statement was here produced, and was

Aaron (a slave) v. The State.

identified by the witness, but was not offered in evidence on the trial.) " The witness then proceeded with his testimony, as follows : 'In the afternoon of said 27th April, witness accompanied the prisoner, with said Underwood and others, while on the way, in the custody of said Washington Nelson, from the place of said examination, to the residence of witness, where the prisoner was to be kept that night, to await the examination on the next day before said justices. During this journey, witness conversed with the prisoner respecting the murder of Boudet; but he does not remember anything that he said to the prisoner in that conversation. Said Underwood, and others in the company, also conversed with him concerning the same matter ; but witness could not remember anything that was said to the prisoner in said conversation. That night also, while the prisoner was at his house in the custody of said Washington Nelson, witness again talked with him respecting said murder ; but he could not remember what he said to the prisoner in that conversation. On the next morning, while on their way to the place of the adjourned examination, said Underwood and witness again talked with the prisoner, respecting the murder ; but witness could not remember the remarks made by either himself or said Underwood on this occasion. These last conversations occurred shortly before the prisoner made his said confession to Washington Nelson. During said journey, and just before the prisoner made said confession to Washington Nelson, the prisoner was walking with the said W. Nelson, a little in advance of the rest of the company. After proceeding some distance, said Washington Nelson and the prisoner stopped, and the rest of the company came up with them ; and said W. Nelson then informed them that the prisoner had made a confession to him. Witness did not know what had passed between said W. Nelson and the prisoner while they were walking in advance of the rest of the company, or immediately previous to the making of said confession. When witness and the rest of the company came up, witness asked the prisoner to tell them what he knew of the murder of the deceased ; and the prisoner thereupon made a statement, implicating himself. Witness

did not caution the prisoner against implicating himself. At the first examination, on said 27th April, 1858, witness instructed the prisoner, when he was sworn, to tell the truth. Witness made no promises or threats to the prisoner, to ind' ɔe a confession by him.

"The prisoner, by his counsel, thereupon objected to the admission of said confession made to said witness, for the same reasons already urged to the admission of the statements made by him to said Washington Nelson and Eslava; and also for this additional reason, that said witness was a justice of the peace, and was associated with said Underwood in the examination of the prisoner on the charge of killing the deceased, and, while occupying this official position towards the prisoner, and while the examination of the prisoner before him on said charges was not yet completed, he failed to caution the prisoner against implicating himself in his said statements. The court overruled the objections, and the prisoner excepted.

"The witness then proceeded with his testimony, as follows: The prisoner's confession was made to witness on the morning of April 28, 1858. On the same day, in the afternoon, witness and said Underwood resumed their adjourned examination of the prisoner in their official capacity aforesaid; and said Underwood, in the presence of witness, reduced to writing the confession which the prisoner had made to witness in the forenoon; which written statement was subscribed by the prisoner with his mark, sworn to before said Underwood, and attested by him. Said Underwood did not write down all that the prisoner had said to witness in said confession, but all that he deemed material at the time, and substantially all that the prisoner had stated to witness in said confession. The prisoner thereupon objected to any oral evidence of the confession alleged to have been made to said witness, because it appeared that the same had been reduced to writing soon after it was made, and had been sworn to and subscribed before said examining court as aforesaid. The court overruled the objection, and the prisoner excepted; and the court then allowed the witness to state to the jury the confession made to him by the prisoner, which the witness stated substan-

Aaron (a slave) v. The State.

tially as follows : 'It is no use denying it any more ; all we stated yesterday were lies. Ranty and I pledged each other that we would not tell. I am convinced I am to be hung, because I dreamed last night that my two hands were fastened together, and were on fire; and that there was a book suspended before them, and it caught fire, and burned all the leaves. The book had a leather cover, just like the one you swore me on yesterday.' The witness then went on to state, that the prisoner said, that he went to Ranty's, and found him in his garden ; that he asked him if he had any liquor in the house, as he was chilly; that he also asked Ranty if old Louis had any tobacco, and that Ranty replied he did not know; that he then said to Ranty, 'If you've got a picayune, I have another, and we can go down to old Louis' and get whiskey; that Ranty said, he had a boy there that was subject to fits, and he could not leave him; that he then promised to stay and take care of the boy, if Ranty would go; that Ranty then said, that old Louis was mad with him, and had threatened to shoot him, if he caught him about his place ; that he then said, 'Louis is a good old man, let's go together, and he wont hurt you;' that Ranty then said he would go down and kill him, and he got down a saw, and sawed a stick at the end of his shanty; that he went with Ranty, and begged him not to hurt the old man, as he had been good and kind to him, and he would not like to see him hurt ; that Ranty declared he would kill him ; that Ranty went in when they got to the shop, while he remained outside ; that he heard Ranty give the old man two or three blows, and the old man cried out 'Oh ! Oh !' that he went around to the door, and Ranty was coming out, but went back again, and took a knife from a chest, and cut the old man four or five times ; that he said to Ranty, when Ranty took up the knife, 'Don't cut him, you have served him bad enough;' that Ranty said, he had gone thus far, and he would finish him; that Ranty took the stick from under the old man, and threw it in a certain direction, and also the knife; that all he had to do with it was, that he went in and hit the old man in the head twice with a spade, after Ranty had cut him; that Ranty got whiskey from a big jug, and some

money over the door; that Ranty gave him eleven dollars,
and promised to give him more when the matter was hushed
up; that when they returned from Ranty's, he went in a
certain direction to the piney woods; that Ranty was bare-
footed, and stepped from turf to turf so as not to leave any
of his tracks behind. The witness stated, also, that he
found both the knife and the stick in the direction pointed
out by the prisoner; that they afterwards went to Ranty's
shanty, and found the piece from which the stick had been
sawed, under the end of Ranty's shanty, and the saw-dust
was also visible on the ground; that the prisoner also
showed them where Ranty had put the saw after sawing
the stick, and, on examination, they found the saw in that
place, and the prisoner recognized it; that they also found
a barefooted track in the direction mentioned by the pris-
oner, which he said was Ranty's. There was also evidence,
by several witnesses, as to the character of the wounds of
the deceased, showing that there were indications of blows
on his head, and stabs, as with a knife, about his chest.".

The jury having returned a verdict of "guilty as charged
in the first count of the indictment," the defendant moved
in arrest of judgment, because the first count of the in-
dictment did not allege that the offense was committed
with malice aforethought; "because the verdict of the jury
finds him guilty of no certain offense known to the law;"
and also on the following ground, as stated in the motion:
"This defendant was tried at the fall term, 1860, of this
court, on the indictment purporting to have been found by
the grand jury of Baldwin county, and sent up to this
court by the clerk of said circuit court of Baldwin; at
which said trial, the jury returned a verdict of 'guilty as
charged in the first count of the indictment,' and said no-
thing in respect to the second count in said indictment. At
the present term of this court, the defendant was tried a
second time upon said indictment; and, before proceeding
to trial, the acting solicitor, at the instance of the court,
entered a *nolle-prosequi* as to the second count in the indict-
ment; and, upon said second trial, the jury returned a ver-
dict of 'guilty as charged in the first count.' On the 28th
May, 1863, at the present term of the court, the slave

Ranty was tried on said indictment; and before trial, on demurrer filed by his counsel, the said first count in the indictment was declared by this court to be insufficient, and the trial of said Ranty thereupon proceeded, by order of the court, on the second count in said indictment alone." The defendant also moved "that he be discharged by the court, on the ground that there is no indictment in this court against him, and he has been tried and convicted of no offense." The motion in arrest of judgment, and the motion for a discharge, were both overruled by the court; but no exception was reserved to these rulings.

JAMES BOND, and CHARLES H. MORSE, for the prisoner.

M. A. BALDWIN, Attorney-General, *contra.*

STONE, J.—The record informs us, that copies of the indictment, and of the list of jurors summoned for the trial of the prisoner, were served on him two entire days before the day appointed for his trial. The prisoner was in actual confinement at the time. It is objected, that the service was not also upon the prisoner's counsel, and that the papers, when served, were not read to the prisoner. There is nothing in either of these objections; the statute not requiring either of these things to be done, unless, when the prisoner is not in actual confinement, the first named rule must be conformed to, in a certain contingency.—Code, § 3576.

[2.] The question of the admissibility of the confessions of the accused, as evidence against him, is not materially different from the same question, as shown in the record when this case was formerly before us. We then held the confessions admissible, and we hold that the confessions disclosed in this record were competent evidence against the accused.—See *Aaron v. The State*, 37 Ala.

[3.] The point made on the motion in arrest of judgment rests on the following facts: Aaron and Ranty, two slaves, were jointly indicted for killing Louis Boudet, a white man. The indictment contained two counts, one for unlawfully and maliciously killing, and the other for unlawfully and voluntarily killing the deceased. There was a

severance, and the two defendants were tried separately.
On the first trial of Aaron, the verdict was in the following
language: "We, the jury, find the prisoner, Aaron, guilty
as charged in the first count of the indictment." Subse-
quently, the conviction had upon that finding of the jury,
against Aaron, was reversed by this court. At a later term,
Aaron was again put on trial on the first count of said
indictment, the proscuting attorney entering a *nolle-prosequi*
on the second count; aud the prisoner was again found
guilty. Between the rendering of the second verdict of
guilty in Aaron's case, and the sentence pronounced against
him, Ranty had his trial in the same court, and at the same
term. His demurrer to the first count of the indictment was
sustained; and he was tried and acquitted on the second
count. Thereupon, Aaron moved in arrest of judgment;
and the question is thus presented, Does the verdict
rendered against Aaron on the first trial, being a virtual
acquittal on the second count, so operate as to prevent any
conviction of him under this indictment, the two counts
being each for one and the same offense, to-wit, voluntary
manslaughter? Is it true, that being, by the implied
acquittal on the second count, found not guilty of man-
slaughter, he cannot be convicted under the first count,
which charges the same offense?

Such argument answers itself. Conceding both counts
to be in manslaughter, and charging one and the same
offense, if the verdict be held to be an acquittal of that
offense, because it in effect finds the defendant not guilty
under the second count; by the same line of argument, the
verdict must be held to be an affirmation that the defend-
ant is guilty of manslaughter, because it finds him guilty
of that offense under the first count. But we are not left
to this line of argument; for, although the two counts may
alike charge the crime of voluntary manslaughter, and may
be in law the same, they are widely different in fact, because
*maliciously* and *voluntarily* are words of decidedly different
signification. In such case, it is very clear that, if the
jury had expressly found the defendant guilty on the first
count, and not guilty on the second, such finding, on a trial
after reversal, could not be regarded as a bar to a second
conviction on the first count.

Aaron (a slave) v. The State.

In what we have said, we do not wish to be understood as affirming, that an acquittal would necessarily have followed if the two counts had not differed materially in averment. The books abound with cases, in which the indictment contains several counts, each charging the same offense; and we are not aware that it has ever been ruled that, in such cases, there must be a conviction on each count, or there can not be on either.—See 1 Waterman's Archbold, 93-4, and note 2.

[4.] It is contended that the judgment should have been arrested, because there was, in fact, no indictment pending against Aaron; the first count having been pronounced defective, under Ranty's demurrer, and the second count having been *nolle-prossed* in Aaron's case. There is nothing in this argument. The judgment of the court in Ranty's case could neither benefit nor prejudice Aaron's rights. The judgment was *res inter alios acta*, and could not, in any way, affect the sufficiency of the indictment as against Aaron. Each count in the indictment was clearly good as a count in voluntary manslaughter; and if the first count contained unnecessary averments, its validity was not thereby impaired. The most that could result from such unnecessary averments, would be to hold the prosecuting attorney to the proof of it.—See *Johnson v. The State*, 35 Ala. 363, and authorities cited.

[5.] On the remaining question, we think the conviction must be reversed. When the venue, in a criminal case, is changed, the law makes it the duty of the clerk to make out a transcript, and forward it to the clerk of the county in which the trial is ordered to be had.—Code, § 3613. The defendant must be tried on the copy of the indictment so certified.—Code, § 3615. The copy of the indictment, thus certified, becomes *the indictment* on which the trial must be had; but it may be amended, or rectified, under the direction of the court to which the case is transferred, if necessary. A certified transcript of the record, not under the direction of the court, or pursuant to *certiorari*, or a transcript made in another cause, can not be regarded as an omitted portion of the record certified, or, an error rectified, in compliance with the statute.—Code

6

§ 3615. The transcript certified by the clerk is so confused in dates, that it fails to satisfy us that it contains the caption of the grand jury by which the indictment was found. This may be, and probably is, a clerical error; but we fear to indulge in speculation, in cases as grave as the present. The transcript should be rectified or amended, as the law points out.—See *Aaron v. The State*, 37 Ala.; *Bramlett v. The State*, 31 Ala. 376.

The judgment of the circuit court is reversed, and the cause remanded. Let the prisoner remain in custody, until discharged by due course of law.